FILED

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JUN 2 8 2012

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

TOMMY LYNN SELLS,                §
TDCJ No. 999367,                 §
                                 §
            Petitioner,          §
                                 §
V.                               §     CIVIL NO.  SA-08-CA-465-OG
                                 §
RICK THALER, Director,           §
Texas Department of Criminal     §
Justice, Correctional            §
Institutions Division,           §
                                 §
            Respondent.          §

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

Petitioner Tommy Lynn Sells originally filed this federal
habeas corpus action in the Del Rio Division of this Court,
collaterally attacking his September, 2000 Val Verde County
conviction for the capital murder of Kaylene Harris on December
31, 1999.  Following a change of venue and multiple stays of this
cause to permit petitioner to return to state court and exhaust
state court remedies on various claims, including an *Atkins*
claim, petitioner filed his amended petition on February 23,
2011, asserting several claims of ineffective assistance by his
trial counsel, complaints regarding the trial court's rulings on
evidentiary and procedural matters, and a number of challenges to
the constitutionality of the Texas capital sentencing scheme.
For the reasons set forth hereinafter, petitioner is entitled to
neither federal habeas corpus relief nor a Certificate of
Appealability from this Court.

## I. <u>Background</u>

A.   <u>The Offense</u>

There is no genuine doubt as to the events of December 31, 1999 which resulted in the death of Kaylene Harris.  Within hours of his arrest on January 2, 2000, petitioner gave a voluntary, videotaped statement in which he described (1) entering the Harris family residence during the early morning hours of December 31, 1999 through a bedroom window with a butcher knife he had brought with him, (2) entering the bedroom where 13-year-old Kaylene was sleeping with her 11-year-old family friend Krystal Surles, (3) turning on the bedroom light and waking Kaylene, (4) slashing Kaylene's throat with his knife, (5) telling a frightened Krystal Surles to remove her hands from her own throat and then slashing her throat as well, and (6) thereafter exiting the Harris residence through the door.[1]

Later on the day of his arrest, petitioner voluntarily accompanied law enforcement officers to the Harris residence

---

[1] An edited copy of the petitioner's videotaped confession was admitted into evidence at petitioner's trial as State Exhibit 1-A and played for the jury. Statement of Facts from petitioner's trial, (henceforth "S.F. Trial"), Volume 21, testimony of Larry Pope, at p. 51. A pair of DVD's containing both the petitioner's complete videotaped confession, as well as the edited version actually admitted into evidence during trial, appear among the state court records in this cause.

where he walked them through a videotaped tour of the crime scene

and again described his actions on the night of the murder.[2]

In what her physician described as a "remarkable" and

"amazing" turn of events,[3] once petitioner fled the scene,

Krystal Surles survived her injuries and managed to walk to a

neighboring residence, where she indicated nonverbally her need

for help and the need for help to be summoned to the Harris

residence.[4]

---

[2] The videotape recording of petitioner's "walk-through" at the crime scene was admitted into evidence at petitioner's trial as State Exhibit no. 3 and played for the jury. S.F. Trial, Volume 19, testimony of John W. Allen, at p. 165. A copy of the videotape of the petitioner's crime scene "walk-through" appears on a DVD among the state court records herein.

[3] One of the physicians who treated Krystal Surles at the University of Texas Health Science Center in San Antonio testified (1) Krystal's injuries were normally lethal, (2) it was "remarkable" emergency medical personnel in Del Rio were able to intubate Krystal due to the extent of her injuries and the accompanying swelling and distortion resulting therefrom, (3) "it is by the grace of God that she is alive today," (4) Krystal suffered a five-inch wound across her neck which nearly severed her carotid artery and did penetrate through her thyroid cartilage and sever a portion of her vocal cords, (5) Krystal's injuries rendered her unable to speak, and (6) Krystal also had defensive wounds to both her hands. S.F. Trial, Volume 21, testimony of Dr. Cynthia Beamer, at pp. 32-37.

[4] S.F. Trial, Volume 19, testimony of Krystal Surles, at pp. 100-10; testimony of Herbert H. Betz, at pp. 116-24.
The neighbor to whose residence Krystal walked after she and Kaylene were attacked by petitioner testified at petitioner's trial (1) he was awakened just before five a.m. on December 31, 1999 by his door bell ringing, (2) he asked who was there but heard no response, (3) when he flipped on the porch light, he saw a little girl covered in blood, (4) the girl pointed to her throat, which he could see had been slashed, (5) the girl could not talk, (6) his wife cared for the girl while he called 9-11,

At petitioner's trial, Krystal Surles testified without contradiction (1) she was awakened by the sound of Kaylene's voice saying "help," (2) when she awoke, the light was on in the bedroom and she could see petitioner's hands covering Kaylene's mouth, (3) petitioner had a knife in his right hand, (4) she saw petitioner slit Kaylene's throat, (5) Kaylene turned, grabbed a poster off the wall, fell, and began making "bad noises," gasping for air and gurgling, (6) petitioner then moved toward Krystal, (7) she promised to be quiet and begged to be spared, (8) petitioner told her to "move your hands," (9) petitioner then reached into the upper bunk where Krystal was lying and cut her throat, (10) Krystal lay still and pretended to be dead, (11) petitioner walked to the bedroom door, looked around, turned off the light, and exited the bedroom, (12) Krystal remained still for another few minutes, then climbed down off the bunk and unsuccessfully tried to leave the house through a bedroom window, (13) she was unable to talk but tried to comfort Kaylene by laying down next to her, (14) she heard a vehicle start up and

---

(6) the girl gestured that she wanted to write something, (7) when they handed her paper and pencil, she wrote "Harrises are hurt," "tell them to hurry,' and "will I live," (7) emergency medical personnel arrived and furnished care to Krystal while he directed law enforcement officers to the Harris residence. S.F. Trial, Volume 19, testimony of Herbert H. Betz, at pp. 116-24.

felt her way to the door, (15) the front door of the house was
unlocked, and (16) she walked to the Betz's home to seek help.[5]

On January 7, 2000, petitioner executed two voluntary
written statements detailing his actions on the night of the
murder and stating, for the first time, he had cut off Kaylene's
underwear and molested her before he slashed her throat.[6]

_____

[5] S.F. Trial, Volume 19, testimony of Krystal Surles, at pp.
87-107.

[6] Petitioner's written statements were admitted into
evidence at petitioner's trial as State Exhibit nos. 4 and 5 and
read in open court to the jury. S.F. Trial, Volume 20, testimony
of Larry Pope, at p. 170. Copies of petitioner's two written
statements appear in S.F. Trial, Volume 28.
    In his first, and longer, of those two statements, i.e.,
State Exhibit no. 4, petitioner recounted a meeting with Terry
Harris, Kaylene's father, on December 30, 1999 at a convenience
store, during which Harris informed petitioner he was going to
Kansas and would re-pay petitioner money which Harris owed
petitioner for cocaine once Harris returned from Kansas.
Petitioner also stated he later became angry with Harris for not
timely repaying petitioner and "decided to do something about
it." Petitioner explained he went home, obtained a knife and
some beer, and drove to the Harris residence. Petitioner then
recounted his burglary of the Harris residence and fatal assault
upon Kaylene.
    More specifically, petitioner stated in State Exhibit no. 4,
in pertinent part, as follows:
        I got out of the car and walked around the
    [Harris] house. I tried to get in the back door of the
    house. The back door was locked I tried to trip the
    door lock where it goes into the frame of the door by
    using the knife blade but I couldn't. The dog started
    barking so I walked around to the front of the house
    where the dog was penned up. I let the dog smell my
    hand and I petted him.
        He quit barking. I went to the back of the
    trailer by the air conditioner. I took a screen off
    the window there and tried to get in. [T]he window was
    locked and I couldn't get in. I went back around to
    the front of the trailer by the dog pen and noticed the

window on that end of the trailer was open.  I took the
screen off and crawled in the window.  When I got in I
saw a little boy in the bed in that room.  He spoke to
me and said "I wish you all would quit coming in my
room."  I knew this was the little blind boy, I had met
him before.  I have been out to Terry's house several
times before and I had been inside his house before.  I
walked out of the bedroom into a bedroom beside it.  I
struck my lighter and looked in this room.  There was a
small girl sleeping in this room.  I think I looked
into the room where the murder took place but I'm not
sure.  I know I walked down to the other end of the
trailer.  I looked in Terry's bedroom.  Terry's wife
and a little girl were sleeping in that room.  I think
I touched Terry's wife on the leg.  I still didn't know
what I was going to do.  I left that room and went all
the way back to the other end of the trailer.  I walked
into the bedroom on that end of the trailer.  This is
the bedroom where the murder took place.  I don't
remember how she woke up but I do know I layed [sic]
down beside the girl on the bottom bunk and I cut her
panties off with the knife.  I think I cut her bra.  I
touch [sic] her between the legs and I touched her
breast.  She wasn't fighting me.  The she jumped out of
bed, she jumped out on the side away from the door.
She told the girl on the top bunk to go get moma [sic].
I stood in front of the bedroom door to block it.  The
door was already closed.  She came toward the door like
she was going to try to get out the door.  I stabbed
her with the knife.  She said something like, look you
cut me.  I turned on the bedroom light and she showed
me her arm.  I walked toward her, I reached out and
sliced her throat.  She fell down at the foot of the
bed.  *I reached down and I cut her throat a couple more
times*.  I started to walk out of the room and I
remember [sic] the little girl on the top bunk.  I
walked over to the side of the bed and laid the knife
across her throat and cut her throat.  I walked out of
the room toward the back door  When I got about to the
kitchen I heard an alarm clock got [sic] off.  It was
making a beeping sound.  I walked back toward the other
end of the trailer where the sound was coming from.
The alarm clock was in the little blind boy's room.  I
went in this room, I picked up the clock and turned the
alarm off. I don't remember seeing the little boy in
the room when I did this.

B.   Indictments

On February 8, 2000, a Val Verde County grand jury indicted
petitioner on two counts of capital murder, to wit, intentionally
murdering Kaylene by cutting her throat while in the course of
committing the offenses of (1) burglary of a habitation with
intent to commit aggravated sexual assault and (2) aggravated
sexual assault.[7]  Petitioner was indicted separately for the
attempted murder of Krystal Surles.  The state trial court
consolidated both cases for trial.

--------

> I walked to the back door and left by the door.  I
> closed the door and wiped my fingerprints off the
> doorknob with the sleeve of my jacket.  I picked up the
> screen from the back window.  I walked around front and
> picked up the other screen I had taken off.  I took the
> screens because they would have my fingerprints on
> them. * * *

In the shorter of his two written statements, i.e., State
Exhibit no. 5, petitioner supplemented his earlier account of his
offense, in pertinent part, as follows:
> When I went into the bedroom where the murder
> happened I got in the bottom bunk with the Harris girl.
> I don't know her first name but I knew she was kin
> [sic] Terry Harris.  I don't know what I said but I
> threatened her with the knife to keep her quite [sic].
> I cut her panties off and I cut or pulled her bra off.
> I touched her breast and I put my hand between her legs
> and I put my finger in her vagina.  Shortly after that
> she jumped out of bed and I have already told the rest.

[7] Transcript of pleadings, motions, and other documents
filed in petitioner's state trial court proceeding (henceforth
"Trial Transcript"), at pp. 9-10.
    Petitioner was indicted under a separate cause number on a
charge of attempted murder in connection with his assault upon
Krystal Surles.  The state trial court consolidated the two
charges for trial. Trial Transcript, at p. 131.

7

C.   Guilt-Innocence Phase of Trial

The guilt-innocence phase of petitioner's trial commenced on September 12, 2000.  At the outset of trial, petitioner pleaded guilty to the attempted murder of Krystal Surles.[8]

1.   The Evidence

In addition to the evidence summarized above, the prosecution presented testimony from a Del Rio waitress establishing that, on the night of December 30, 1999, petitioner (1) repeatedly solicited sex from her, even offering to pay for same, (2) she rejected all his offers, (3) petitioner eventually left the bar where she worked around 2:15 a.m., and (4) petitioner commented at one point that he had a knife.[9]

Terry Harris, Kaylene's father, testified (1) he knew petitioner through church and had counseled petitioner on marital problems and offered career advice, (2) petitioner had been inside the Harris home at least once and had met all the Harris children, (3) he purchased his truck at the motor vehicle dealership where petitioner worked, (4) petitioner helped him repair a leaky water line in the backyard and he showed petitioner where the family's phone line was located to avoid accidentally cutting the line, (5) the Harris family dog was

---

[8] S.F. Trial, Volume 19, at pp. 13-14, 90-92.

[9] S.F. Trial, Volume 19, testimony of Noell Houchin, at pp. 28-37.

8

familiar with petitioner, (6) the evening before Kaylene's
murder, he had a conversation with petitioner at a convenience
store and informed petitioner he was leaving town on a trip to
Kansas, (7) he reached Kansas around six thirty the following
morning and unsuccessfully attempted to phone home, and (8) when
he returned home, he found his telephone line had been cut near
the area where he and petitioner had repaired the leaky pipe.[10]

Kaylene's mother Crystal Harris testified, in pertinent
part, (1) she was awakened on the morning of December 31, 1999 by
the sound of the Sheriff's department personnel inside her home,
(2) law enforcement officers would not allow her to move toward
the rear of the house where Kaylene's bedroom was located, (3)
she and her surviving children were removed from their home, (4)
she unsuccessfully attempted to telephone her husband, (5) when
she retired the night before, all of the doors were shut and
locked and all but one window (in her son Justin's bedroom) was
locked, (6) petitioner had been to the Harris residence at least
three times to talk with her husband, had met her children, and
was friendly with the family dog, (7) she did not hear the family
dog bark that night, and (8) the family's phone had worked
properly the day before Kaylene's murder.[11]

_____

[10] S.F. Trial, Volume 19, testimony of Terry Harris, at pp.
67-81.

[11] S.F. Trial, Volume 19, testimony of Crystal Harris, at
pp. 39-53.

Kaylene's 14-year-old brother Justin testified (1) he has been blind since birth, (2) he went to bed around 9:30 p.m. on December 30, 1999, (3) his alarm clock went off around 4:30 a.m. while he was in the bath room, (4) someone turned the clock off, (5) he later went back to bed and fell asleep, (6) he never heard anyone in his room that night, (7) when he awoke again, police were asking him if he was okay and taking him outside to a car, and (8) he never heard the family dog bark that night.[12]

Law enforcement officers testified they recovered petitioner's blue jeans, blue-green shirt, and black jacket from the laundry basket at the Sells residence.[13]  Law enforcement personnel also testified they recovered a butcher knife with a bent blade from the field across the road from petitioner's residence, i.e., the location where petitioner indicated he had thrown the murder weapon.[14]

Forensic experts testified (1) blood stains found on petitioner's blue jeans matched those of petitioner and

---

[12] S.F. Trial, Volume 19, testimony of Justin Harris, at pp. 56-64.

[13] S.F. Trial, Volume 19, testimony of John W. Allen, at pp. 165-69; Volume 20, testimony of John W. Allen, at pp. 10-11; Volume 20, testimony of Larry Pope, at pp. 51-52, 59-61; Volume 21, testimony of Larry Dean Stamps, at pp. 19-22.

[14] S.F. Trial, Volume 19, testimony of John W. Allen, at p. 169; Volume 20, testimony of John W. Allen, at p. 11; Volume 21, testimony of Larry Dean Stamps, at pp. 22-24, 26-27.

Kaylene,[15] (2) a blood stain on Kaylene's tee shirt was consistent with a mixture of her blood and petitioner's blood,[16] (3) a pair of pajama shorts found at the base of the bed in Kaylene's bedroom bore stains consistent with a mixture of Kaylene's blood and the blood of another female,[17] (4) blood stains found on Kaylene's panties also contained blood stains consistent with a mixture of Kaylene's blood and the blood of another female,[18] (5) the knife recovered near petitioner's residence contained traces of a female's blood but not Kaylene's,[19] (6) microscopic examination of Kaylene's panties and pajama shorts revealed both had been cut by a knife consistent with the butcher knife recovered near petitioner's residence,[20] (7) pink polyester fibers consistent with Kaylene's pink pajama shorts were found on petitioner's shirt, jacket, and blue jeans,[21] (8) pink cotton and pink acrylic fibers consistent with

---

[15] S.F. Trial, Volume 21, testimony of Cassie Cardine, at p. 73.

[16] *Id.*, at pp. 74-75.

[17] *Id.*, at pp. 75-76.

[18] *Id.*, at pp. 76-77.

[19] *Id.*, at pp. 80-81.

[20] S.F. Trial, Volume 21, testimony of Bradley Mullins, at pp. 104-07.

[21] *Id.*, at p. 112.

Kaylene's pajama shirt were found on petitioner's clothing,[22] (9) black acrylic fibers consistent with petitioner's jacket, blue-green fibers consistent with petitioner's shirt, and black polyester and black rayon fibers consistent with petitioner's jacket were all found on Kaylene's clothing,[23] and (10) three different types of black fibers, all consistent with petitioner's jacket, were found on Kaylene's clothing.[24]

The medical examiner who performed the autopsy on Kaylene's body testified, in pertinent part (1) Kaylene suffered a gaping, five-inch wound across the neck which appeared to have been the product of three separate cuts and which caused rapid blood loss and was fatal within several minutes[25]; (2) Kaylene's neck wound included cuts to the right carotid artery and right jugular vein and the complete cleaving of the top portion of her voice box[26]; (3) Kaylene sustained a total of sixteen stab wounds, three of which went completely through her body[27]; (4) four of these stab wounds were to the left side of Kaylene's chest, three of which

---

[22] *Id.*

[23] *Id.*, at pp. 112-13.

[24] *Id.*, at p. 114.

[25] S.F. Trial, Volume 20, testimony of Jan Garavaglia, at p. 92, 95-96, 117.

[26] *Id.*, at pp. 92-93.

[27] *Id.*, at pp. 97-99.

penetrated into her left lung and the fourth of which penetrated into her right lung, which collectively caused both of Kaylene's lungs to collapse and blood to enter the chest cavity[28]; (5) an abdominal stab wound penetrated six inches into Kaylene's abdominal cavity, through her liver and duodenum[29]; (6) Kaylene sustained multiple stab wounds to the left hip[30]; (7) a stab wound to Kaylene's right lower back cut through her renal artery and inferior vena cava and would have been fatal by itself[31]; (8) Kaylene also sustained superficial wounds to her left arm[32]; (9) of the multiple stab wounds to Kaylene's right arm, one penetrated four inches and another which extended completely through her arm[33]; (10) Kaylene sustained contusions on the right forearm[34]; (11) a superficial linear abrasion and linear contusion in Kaylene's left inguinal crease was consistent with force having been applied to Kaylene's panties and the edges thereof cutting into her flesh[35]; (12) an oval contusion on

---

[28] *Id.*, at pp. 98-99, 114-16.

[29] *Id.*, at pp. 100-01.

[30] *Id.*, at pp. 102-03.

[31] *Id.*, at p. 104.

[32] *Id.*, at pp. 104-06.

[33] *Id.*, at p. 105.

[34] *Id.*, at pp. 107-08.

[35] *Id.*, at pp. 108-09.

Kaylene's inner right thigh was likely caused by a finger or thumb grabbing her there[36]; (13) Kaylene also sustained contusions on the outer right knee and fresh bruises to the front and back of both legs[37]; (14) Kaylene sustained an abrasion to her left inner leg near the knee and multiple bruises to her left calf and knee[38]; (15) Kaylene's body displayed a pattern of bruises to her legs suggesting someone had grabbed both her legs and attempted to pull them apart[39]; and (16) examination of Kaylene's genitals reveals a small, relatively fresh, bruise on the internal aspect of the labia minora with some reddening of the hymenal ring.[40]  In addition to her fatal neck wound, the medical examiner testified the stab wounds to Kaylene's chest, liver, and renal artery, respectively, would each independently have been sufficient to have caused her death.[41]

Petitioner offered no evidence at the guilt-innocence phase of his capital murder trial.

---

[36] *Id.*, at p. 110.

[37] *Id.*, at pp. 110-11.

[38] *Id.*, at p. 112.

[39] *Id.*, at pp. 113, 122.

[40] *Id.*, at pp. 113-14.

[41] *Id.*, at pp. 115-17.

2.   The Verdict

The petitioner's jury heard oral arguments, retired, and began its deliberations at approximately 1:35 p.m. on September 18, 2000.[42]  At approximately 2:45 p.m. that same date, the jury advised the bailiff they had reached their verdict.[43]  Later that afternoon, the jury returned its verdict, finding petitioner guilty of the capital murder of Kaylene Harris.[44]  The trial court ordered the jury sequestered.[45]

D.   Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial commenced on September 19, 2000.

1.   The Prosecution's Evidence

The prosecution called a former Val Verde County Detention Center inmate who had been housed in a cell adjacent to petitioner's for a little more than two months who testified (1) when he complained of depression, the petitioner told him to hang himself, (2) in April, 2000, the petitioner became angry and threatened to blind and kill him, and (3) when he reported

---

[42] S.F. Trial, Volume 23, at p. 90.

[43] *Id.*

[44] *Id.*, at pp. 91-92.

[45] *Id.*, at p. 93.

petitioner's threats, jail officials moved him to a different part of the facility.[46]

The prosecution next called a psychologist (Dr. Frederick Mears) who testified (1) based primarily upon a review of petitioner's records and the details of petitioner's capital offense (including photographs of the victim's injuries), the petitioner was "off the scale" in terms of the likelihood of future violence by petitioner, (2) the past is the best indicator of future violent behavior, (3) Kaylene's autopsy revealed a number of post-mortem wounds which he described as analogous to body desecration and mutilation, (4) the nature of many of Kaylene's non-fatal wounds suggested the petitioner had derived pleasure from the brutality of his capital offense, (5) anti-social personalities such as the petitioner are highly manipulative, (6) petitioner displayed a cavalier attitude on his videotaped confession and crime scene walk-through indicative of a lack of emotion and absolute indifference to death typical of an anti-social personality, (7) he detected an increase or escalation over time in the level of violence involved in petitioner's criminal history, and (8) petitioner displayed no

---

[46] S.F. Trial, Volume 24, testimony of Danny Calderon, at pp. 42-51.

remorse for his criminal conduct on either of the videotapes made January 2, 2000.[47]

A Texas Department of Public Safety fingerprint analyst testified petitioner's fingerprints matched those on a pair of pen packets, one from Wyoming reflecting petitioner's conviction for auto theft, and another from West Virginia, reflecting petitioner's conviction for "malicious wounding."[48]

2.   The Defense's Evidence

The defense called the Val Verde County jail administrator who testified petitioner had only two disciplinary referrals during petitioner's stay of more than eight months at that facility, one of which was a verbal threat against an inmate in an adjoining cell.[49]

The defense called its own psychologist (Dr. Windel Lee Dickerson) who testified, in pertinent part, (1) he had interviewed petitioner for two days in April, 2000, listened to a recorded interview of petitioner's mother, reviewed petitioner's prison records, and spoken with persons who had known petitioner

---

[47] S.F. Trial, Volume 24, testimony of Dr. Frederick Mears, at pp. 55-85.

[48] S.F. Trial, Volume 24, testimony of Charles Joe Parker, at pp. 86-91.
The two pen packets were admitted into evidence as State Exhibit Nos. 104 and 105 and appear in S.F. Trial, Volume 28.

[49] S.F. Trial, Volume 24, testimony of Patricia Hobrecht, at pp. 101-03.

all his life, (2) he suspected petitioner had been sexually abused while quite young by a pedophile who lived in petitioner's neighborhood but petitioner would not discuss the subject, (3) petitioner had a profound history of substance abuse that began possibly as early as age seven and was a serious problem by the time petitioner reached age fifteen, (4) an EEG revealed a widespread pattern of diffuse abnormality in petitioner's brain function, including coherence problems, phase and symmetry problems, and problems with the front and rear portions of petitioner's brain communicating well with each other, (5) he administered various psychological tests to petitioner which revealed petitioner is a very seriously disordered individual, and (6) in contrast to the prosecution expert's diagnosis of anti-social personality, his diagnosis of petitioner was that of borderline personality disorder with schizoid, avoidant, and anti-social features and possible brain damage but not true anti-social personality.[50]

Dr. Dickerson also testified as follows:

What my examination has revealed to this point is, there is a history of life experience which could be -- which could be considered instigators to violence, things that prompt him. There are conditions that are present in his mind and body which I think dramatically affect his ability to guide and direct his own behavior and resist those instigations [sic] to violence. Those same things that reduce his capacity for self-restraint

---

[50] S.F. Trial, Volume 24, testimony of Dr. Windel Lee Dickerson, at pp. 128-58.

> have also altered his ability -- I think his ability to
> get a wrap around a lot of bad things that has [sic]
> happened in his life and reconstruct them, reposition
> them in his life in such a way that they do not cause
> him the problems that they have caused, so I think when
> I talk about Tommy Lynn Sells, I'm talking about
> somebody who has got a lot of problems that give us
> cause to be very seriously concerned.[51]

Dr. Dickerson testified further that medications had helped

petitioner control his propensity for violence during previous

incarcerations and that, if removed from the rest of the prison

population and properly medicated, it was possible to reduce the

risk factors for future violence and improve petitioner's

capacity for self-management.[52]  Dr. Dickerson also opined that

(1) with the exception of those convicted of sexually motivated

crimes and serial killers, mental health professionals were no

more accurate than other in terms of predicting future violence

by prisoners,[53] and (2) based upon his experience with the Texas

prison system, he believed petitioner could be housed under

conditions that greatly reduced the risk of future violence from

petitioner.[54]

On cross-examination, Dr. Dickerson testified (1) petitioner

scored near the top of the MMPI scale measuring lack of empathy,

---

[51] *Id.*, at p. 160.

[52] *Id.*, at pp. 161-63, 168.

[53] *Id.*, at pp. 165-68.

[54] *Id.*, at pp. 168-73.

(2) persons who score high on that measure are often angry and
unable to express their feelings, have a low frustration
tolerance, and are often irritable, (3) petitioner also had an
elevated paranoia scale, which is not uncommon in prison, and (4)
petitioner's EEG and other medical tests show no brain tumors or
seizure disorders.[55]

On re-direct examination, Dr. Dickerson testified (1)
petitioner will not be free if sentenced to life in prison, (2)
the availability of street drugs in prison is limited, (3) life
in prison reduces or eliminates many of the risk factors for
violence, including concerns over financial stress, unemployment,
and housing stability, (4) inmates assigned to administrative
segregation are held outside the general prison population and
guarded heavily, (5) people tend to grow less violent as they
grow older, (6) petitioner was then 36 years old and would have
to serve at least forty years in prison before becoming eligible
for release on parole, (7) petitioner's medical problems can be
treated in prison, (8) the pool of petitioner's potential victims
is narrowed while he is in prison, (9) the availability of
weapons in prison is reduced, (10) it is easier to monitor and
manage petitioner's mental illness while he is in prison, (11)
the risk of future violence from petitioner in prison is greatly

---

[55] S.F. Trial, Volume 25, testimony of Dr. Windel L.
Dickerson, at pp. 8-16.

reduced, (12) alcohol consumption contributed prominently in every one of petitioner's criminal offenses for which he had been convicted and the availability of alcohol in prison is reduced, (13) in the free world, petitioner is "dangerous as he can be" but, under proper medication and supervision in a prison setting, petitioner's danger level can be reduced "very appreciably," (14) "you have got an individual here who is a very alarming person," and (15) probably seventy five percent of prison inmates could be classified as anti-social, meaning there was nothing extraordinary about Dr. Mears' diagnosis of petitioner.[56]

On re-cross examination, Dr. Dickerson admitted (1) TDCJ inmates can refuse to take prescribed medications, (2) he could not recall petitioner's comments during his videotaped confession in which petitioner confessed to being glad he had been caught because he feared hurting others, (3) petitioner must serve at least forty years before becoming eligible for parole, (4) petitioner has trouble being emotionally involved with others, (5) petitioner's crime was very opportunistic, (6) it is possible to obtain a weapon inside Texas prisons, and (7) prisoners have escaped from Texas prisons, including from death row.[57]

---

[56] *Id.*, at pp. 16-38.

[57] *Id.*, at pp. 38-51.

21

3.   <u>Prosecution's Rebuttal Evidence</u>

The prosecution called the chief investigator for the Texas Special Prison Prosecution Unit, who testified (1) prison rules and regulations will not prevent an inmate intent on violence from being violent, (2) male and female guards and prison personnel are present at all TDCJ facilities and have daily contact with the inmate population, (3) even dangerous inmates have contact with guards, (4) prisoners cannot ordinarily be forced to take medications, and (5) homemade weapons are available in prison.[58]

On cross-examination, Mr. Smithey testified (1) only a small fraction of the more than one hundred fifty thousand TDCJ inmates are responsible for violence in Texas prisons, (2) violence occurs throughout the prison system, even on death row, (3) the only way to assure a prisoner will not be violent is to execute him, (4) not all administrative segregation inmates are handled one-on-one by guards, (5) while there is more security in administrative segregation generally, administrative segregation is not identical at all TDCJ facilities, and (6) administrative segregation is a type of prisoner classification, not a description of a type of TDCJ unit.[59]

---

[58] S.F. Trial, Volume 25, testimony of Royce Smithey, at pp. 58-71.

[59] *Id.*, at pp. 71-82.

22

4.   The Verdict

On September 20, 2000, the petitioner's jury heard closing arguments at the punishment phase of trial and retired to deliberate at approximately 2:28 p.m.[60]  At approximately 4:40 p.m. that same date, the jury sent out a note indicating it had reached its verdict.[61]  Shortly thereafter, the jury returned its verdict in open court, finding (1) beyond a reasonable doubt there was a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society[62] and (2) taking into consideration all of the evidence, including the circumstances of the offense, and the petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment.[63]

E.   Direct Appeal

Petitioner appealed his conviction and sentence in an appellant's brief filed March 19, 2001, in which petitioner

---

[60] S.F. Trial, Volume 25, at pp. 85-121.

[61] Id., at p. 122.

[62] S.F. Trial, Volume 25, at p. 123; Trial Transcript, at p. 272.

[63] S.F. Trial, Volume 25, at p. 123; Trial Transcript, at p. 273.

asserted thirty-six points of error.[64]   The Texas Court of
Criminal Appeals subsequently affirmed petitioner's conviction
and sentence and the United States Supreme Court denied
petitioner's petition for writ of certiorari. *Sells v. State*, 121
S.W.3d 748 (Tex. Crim. App. March 12, 2003), *cert. denied*, 540
U.S. 986 November 3, 2003).

F.   First State Habeas Corpus Proceeding

Petitioner filed his first application for state habeas
corpus relief, i.e., App. no. 62,552-01, on January 30, 2003,
asserting therein six complaints of ineffective assistance by his
trial counsel.[65]

---

[64] Petitioner's state appellate counsel, attorney Mark
Stevens, asserted points of error on petitioner's behalf (1)
attacking the trial court's admission of petitioner's videotaped
statements, (2) challenging the trial court's exclusion during
the punishment phase of trial of a videotape showing the
administrative segregation facilities at a TDCJ unit, (3)
challenging the trial court's refusal to permit petitioner's
trial counsel to voir dire the jury venire on their views
regarding Texas parole law, (4) challenging the trial court's
denial of petitioner's challenges for cause against two venire
members, (5) challenging the trial court's refusal to permit
petitioner's trial counsel to voir dire a female venire members
regarding whether she could ever answer the future dangerousness
special issue negatively in the case of a murdered young girl,
(6) challenging the sufficiency of the evidence showing
petitioner sexually assaulted Kaylene Harris, and (7) challenging
the constitutionality of various provisions of the Texas capital
sentencing statute and Texas capital sentencing special issues.

[65] More specifically, although styled as only four claims in
petitioner's initial state habeas corpus application, the
petitioner's first state habeas counsel, attorney Terry McDonald,
argued petitioner's trial counsel rendered ineffective assistance
under the Sixth Amendment (1) by failing to adequately
investigate petitioner's background and present available

The state responded to petitioner's first state habeas corpus application, in part, by presenting the state trial court with an affidavit from petitioner's former trial counsel in which said counsel (1) stated the defense team's court-appointed investigator Vince Gonzalez "spoke with various family members of Tommy Lynn Sells and did not find any helpful mitigation evidence that was not already known," (2) at the request of the defense team, petitioner underwent a PET exam which showed no organic brain damage or signs of schizophrenia, (3) during the pendency of trial, there were no discussions among the defense team regarding any fees other than those earned and paid for by Val

---

mitigating evidence, (2) due to a conflict of interest which arose from a book deal petitioner's trial counsel negotiated concerning said counsel's representation of petitioner, (3) by presenting only one witness during the punishment phase of trial, i.e., Dr. Dickerson, and (4) in contravention of the Texas Constitution by (a) committing each of the foregoing acts, (b) failing to voir dire the jury venire on the subject of parole, and (c) failing to request the assistance of a co-counsel. Transcript of pleadings, motions, and other documents filed in petitioner's first state habeas corpus proceeding (henceforth "First State Habeas Transcript"), at pp. 30-55.

Attached to petitioner's first state habeas application were a pair of affidavits : (1) from Ann Matthews in which she (a) expressed her opinion petitioner's trial defense team was more interested in soliciting payments in exchange for petitioner's confession to other offenses than in vigorously defending petitioner, (b) averred that unidentified persons wired money to the defense team from Missouri, (c) averred petitioner's defense team permitted an author to interview petitioner at some point and used the author to gather information for use at trial, and (d) petitioner's defense team contacted multiple television news magazines about selling petitioner's story, and (2) an affidavit from Bob Schanz in which he recounts information he heard from others about petitioner's defense team.

Verde County, (4) there were never any discussions of book royalties being given or assigned to anyone on the defense team, (5) no one on the defense team ever accepted any remuneration other than that provided as payment by Val Verde County, (6) the defense team chose as a matter of trial strategy not to call any mitigation witnesses other than Dr. Dickerson because of concerns other witnesses might have knowledge of extraneous offenses committed by petitioner which could have been raised and used by the prosecution, including an attempted sexual assault, (7) petitioner approved this defense strategy, and (8) while the trial court originally appointed a second attorney to assist petitioner, and the trial court indicated a willingness to appoint co-counsel to assist petitioner, the petitioner did not want the attorney originally court-appointed as co-counsel to assist at trial and petitioner's trial counsel did not feel he needed a co-counsel for petitioner's trial.[66]

On June 29, 2005, the state habeas trial court issued an Order containing its findings of fact, conclusions of law, and recommendation that petitioner's first state habeas corpus application be denied.[67]

---

[66] Affidavit of Victor Robert Garcia, First State Habeas Transcript, at pp. 73-75.

[67] First State Habeas Transcript, at pp. 97-107.

The Texas Court of Criminal Appeals denied petitioner's first state habeas corpus application in an unpublished per curiam Order based upon the trial court's findings and conclusions. *Ex parte Tommy Lynn Sells*, WR-62,552-01 (Tex. Crim. App. August 31, 2005).

G.   Second State Habeas Corpus Proceeding

On August 17, 2006, petitioner filed his second state habeas corpus application, in which he argued he was mentally retarded and, therefore, exempt from execution pursuant to the Supreme Court's holding in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).[68] On May 23, 2007, the Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application in an unpublished, per curiam, Order based upon petitioner's failure to make a "threshold showing of evidence that would be at least sufficient to support an ultimate conclusion by clear and convincing evidence that he is mentally

_____

[68] Transcript of pleadings, motions, and other documents filed in petitioner's second state habeas corpus proceeding (henceforth "Second State Habeas Transcript"), WR-62,552-02, at pp. 4-33.

Attorney Alan Futrell filed petitioner's second state habeas corpus application and attached thereto affidavits and sworn statements from an educator experienced in assessing mental retardation in students named James Patton, petitioner's mother (Nina Lovins), petitioner's brother Timmy Sells, and petitioner's trial expert Dr. Windel Lee Dickerson, along with properly authenticated copies of records from several schools petitioner attended. Second State Habeas Transcript, at pp. 36-88.

retarded." *Ex parte Tommy Lynn Sells*, WR-62,552-02, 2007 WL
1493151 (Tex. Crim. App. May 23, 2007).

H.   Third State Habeas Corpus Proceeding

On September 15, 2010, petitioner filed his third state
habeas corpus application, in which he asserted ten new claims of
ineffective assistance by his trial counsel, along with a new
*Brady* claim premised upon the prosecution's alleged failure to
disclose to petitioner's trial counsel a booking sheet that was
introduced into evidence by petitioner's trial counsel during a
pretrial hearing.[69]

---

[69] Transcript of pleadings, motions, and other documents
filed in petitioner's third state habeas corpus proceeding
(henceforth "Third State Habeas Transcript"), WR-62-552-03, at
pp. 5-72.  Petitioner's ineffective assistance claims consisted
of arguments that petitioner's trial counsel rendered ineffective
assistance virtue of (1) the state trial court's denial of
petitioner's motions for appointment of an investigator and
mental health expert, (2) said trial counsel's failure to request
a continuance to complete the investigation into potentially
mitigating evidence available in Missouri, (3) said counsel's
failure to subpoena out-of-state witnesses, including
petitioner's family members, and others who could have testified
regarding petitioner's background and abused and neglected
childhood, (4) said counsel's failure to ask Dr. Dickerson
unspecified questions that would have "personalized" petitioner,
(5) said counsel's failure to investigate, develop, and present
available, potentially mitigating, evidence showing petitioner
suffers from fetal alcohol syndrome, (6) restrictions the state
trial court placed on the ability of the defense team to
interview petitioner's family and friends located in other
jurisdictions, (7) said counsel's failure to obtain petitioner's
mental health records and to seek a mental health evaluation of
petitioner, including neuropsychological testing of petitioner,
(8) said counsel's failure to object to the prosecutor's argument
that ten votes were needed for petitioner to receive a life
sentence, (9) said counsel's failure to inform petitioner's
appellate and state habeas counsel that the scope of trial

The Texas Court of Criminal Appeals dismissed petitioner's third state habeas corpus application pursuant to state writ-abuse principles. *Ex parte Tommy Lynn Sells*, WR-62,552-03, 2010 WL 5168591 (Tex. Crim. App. December 15, 2010).

---

counsel's investigation into petitioner's background has been restricted financially and geographically, and (10) petitioner's original state habeas counsel failed to investigate, develop, and present all the claims contained in petitioner's third state habeas corpus application. Petitioner's new *Brady* claim was premised upon the prosecution's alleged failure to disclose to petitioner's trial counsel petitioner's booking sheet from the Val Verde County Detention Center dated January 2, 2000 on which a jail employee had typed an "X" next to "mental deficiency." This same document was admitted into evidence as D-X-1 by petitioner's trial counsel during a pretrial hearing held June 25, 2000. S.F. Trial, Volume 3, testimony of Larry Pope, at pp. 73-75. The booking sheet in question appears at S.F. Trial, Volume 26, among the exhibits from petitioner's pretrial *Jackson v. Denno* hearing.

Attorneys Alan Futrell and John E. Wright, who filed petitioner's third state habeas application, attached thereto a plethora of affidavits, sworn statements, and authenticated documents, including (1) a pair of affidavits from petitioner's mother (Nina Lovins)(one of which was a copy of an affidavit petitioner attached to his second state habeas corpus application and the other of which was dated September 5, 2010), (2) another copy of the same August 12, 2006 affidavit from Dr. Dickerson petitioner attached to his second state habeas corpus application, (2) a pair of affidavits from petitioner's brother Timmy Sells (one of which was a copy of the same affidavit that had been attached to petitioner's second state habeas corpus application and the other of which was dated September 5, 2010), (3) affidavits of Vince Gonzales (dated September 14, 2010), Mary Howell (dated September 5, 2010), and Paul Hunt (dated August 30, 2010), (4) a fetal alcohol syndrome disorder screening questionnaire, (5) the affidavit of Dr. Richard Adler dated September 14, 2010 and several medical journal articles on fetal alcohol syndrome, (6) the affidavit of Dr. Antoinette McGarrahan dated July 10, 2009, (7) the affidavit of Dr. Brian Skop dated September 14, 2009, (8) petitioner's January 2, 2000 booking sheet from the Val Verde County Detention Center, and (9) various documents from petitioner's trial court proceedings, including his judgment.

H.   <u>Proceedings in Federal Court</u>

Petitioner filed his original petition in the Del Rio Division of this Court on August 16, 2006. *Docket entry no. 12.*

The first stay of proceedings in this cause to permit petitioner to return to state court to present then-unexhausted claims took place on August 23, 2006. *Docket entry no. 14.*  That stay was lifted August 4, 2008. *Docket entry no. 25.*

Thereafter, petitioner "supplemented" his claims herein on no less than four separate occasions. *Docket entry nos. 70, 71, 82, 86.*

A second stay was issued August 16, 2010 to permit petitioner to return to state court once more and exhaust available state habeas corpus remedies on a wide range of new claims petitioner had presented in his various supplemental pleadings. *Docket entry no. 106.*  That second stay was lifted December 17, 2010. *Docket entry no. 115.*

On February 23, 2011, petitioner filed his amended federal habeas corpus petition, asserting therein numerous claims of ineffective assistance by his trial counsel, complaints about the trial court's limitations on pretrial investigative funding, complaints about the trial court's restrictions on petitioner's trial counsel's voir dire examination of the jury venire, the trial court's denial of petitioner's challenges for cause to two members of the jury venire, the trial court's exclusion of a

proffered videotape showing the administrative segregation facilities at a TDCJ unit, and multiple challenges to the constitutionality of the Texas capital sentencing scheme and capital sentencing special issues. *Docket entry no. 122.*

Petitioner attached to his amended petition voluminous documents, many of which petitioner has never presented to any state court.[70]

---

[70] Among the many documents petitioner presented to this Court for the first time as attachments and exhibits to his amended petition which petitioner has never presented to any state court, despite years of stays and delays for the very purpose of allowing petitioner to exhaust available state remedies on his new claims and new evidence, are (1) an undated, unsworn declaration by petitioner's mother Nina Lovins (Petitioner's Exhibit 122-4), (2) an unsworn declaration by petitioner's brother Timmy Sells dated October 28, 2009 (Petitioner's Exhibit 122-6), (3) an unsworn declaration by Mary Howell dated March 11, 2010 (Petitioner's exhibit 122-7), (4) an unsworn declaration by Lance E. Page dated December 12, 2009 (Petitioner's Exhibit 122-8), (5) an unsworn declaration by Sandi Wicoff dated October 29, 2009 together with an unauthenticated transcription of a unverified interview (Petitioner's Exhibit 122-9), (6) an unsworn declaration by Paul Hunt dated December 11, 2009 (Petitioner's Exhibit 122-10), (7) an affidavit of Danny D. Hunter dated October 5, 2007 (Petitioner's Exhibit 122-11), (8) an unsworn, undated, declaration of Jessica Y. Levrie Blanco Sells (Petitioner's exhibit 122-13), (9) an affidavit of John Pippen dated October 5, 2009 (Petitioner's Exhibit 122-14), (10) an unsworn declaration by Guadalupe D. Guzman dated October 27, 2009 (Petitioner's exhibit 122-15), (11) a report dated September 23, 2008 from CLS Mitigation and Consulting Services accompanied by copies of petitioner's medical records from a 1981 hospitalization reflecting petitioner has significant anger issues and feels the need to strike out at others (Petitioner's exhibit 122-22), (12) a business records affidavit dated January 20, 2009 and 236 pages of records from the Missouri Department of Corrections reporting numerous instances of disciplinary infractions committed by petitioner during petitioner's incarceration for "felonious stealing" at age nineteen and following the revocation of petitioner's parole for DWI

On May 16, 2011, respondent filed his answer to petitioner's amended petition, arguing therein, in part, (1) many of petitioner's claims herein are procedurally defaulted by virtue of the dismissal of petitioner's third state habeas corpus application and (2) petitioner's reliance on voluminous new documents which fundamentally alter the nature of many of petitioner's otherwise exhausted ineffective assistance claims and render same unexhausted. *Docket entry no. 125.*

On August 8, 2011, petitioner filed his reply to respondent's answer, arguing therein that ineffective assistance by petitioner's initial state habeas counsel mandated rejection of respondent's procedural default defense and compel this Court to address the merits of all of petitioner's claims herein. *Docket entry no. 134.* Petitioner attached thereto more voluminous exhibits, once again many of which have never been presented by petitioner to any state court.[71]

---

(Petitioner's Exhibit 122-23), and (13) a mental health evaluation dated March 13, 1990 performed by personnel with the Wyoming State Hospital indicating petitioner displayed low-average IQ and an anti-social personality and a February 29, 1990 report by a Dr. Paul C. Jennings indicating petitioner was then functioning in the low average range intellectually (Petitioner's Exhibit 122-24).

[71] Among the many new documents which apparently have never been presented to any state court in support of his claims herein are (1) an affidavit by petitioner's first state habeas counsel, attorney Terry McDonald, dated August 4, 2011 (Petitioner's exhibit 134-2), (2) a trio of state habeas corpus applications filed by attorney McDonald on behalf of Ramiro Gonzales, Geronimo Gutierrez, and Taichin Preyor (Petitioner's exhibits 134-3, 134-

## II. Standard of Review

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 l.Ed.2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685,

---

4, and 134-5, respectively), and (3) a state habeas corpus application and numerous exhibits attached thereto apparently filed on behalf of Lejames Norman in September, 2010 (Petitioner's exhibits 134-5 and 134-6).

694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the
"contrary to" clause, a federal habeas court may grant relief if
(1) the state court arrives at a conclusion opposite to that
reached by the Supreme Court on a question of law or (2) the
state court decides a case differently than the Supreme Court on
a set of materially indistinguishable facts. *Brown v. Payton*, 544
U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12,
15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's
decision is 'contrary to' our clearly established law if it
'applies a rule that contradicts the governing law set forth in
our cases' or it 'confronts a set of facts that are materially
indistinguishable from a decision of this Court and nevertheless
arrives at a result different from our precedent.'"). A state
court's failure to cite governing Supreme Court authority does
not, *per se*, establish the state court's decision is "contrary
to" clearly established federal law: "the state court need not
even be aware of our precedents, 'so long as neither the
reasoning nor the result of the state-court decisions contradicts
them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal
habeas court may grant relief if the state court identifies the
correct governing legal principle from the Supreme Court's
decisions but unreasonably applies that principle to the facts of
the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125

S.Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, ___ U.S. ___, ___, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010)("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has recently explained:

> Under the Antiterrorism and Effective Death Penalty
> Act, a state prisoner seeking a writ of habeas corpus
> from a federal court "must show that the state court's
> ruling on the claim being presented in federal court
> was so lacking in justification that there was an error
> well understood and comprehended in existing law beyond
> any possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S.Ct. 26, 27, 181 L.Ed.2d
328 (2011)(quoting *Harrington v. Richter*, 562 U.S. ___, ___, 131
S.Ct. 770, 786-87, 178 L.Ed.2d 624 (2011)).

Legal principles are "clearly established" for purposes of
AEDPA review when the holdings, as opposed to the dicta, of
Supreme Court decisions as of the time of the relevant state-
court decision establish those principles. *Yarborough v.
Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d
938 (2004)("We look for 'the governing legal principle or
principles set forth by the Supreme Court at the time the state
court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63,
71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal
habeas review of state court fact findings.  Section 2254(d)(2)
of Title 28, United States Code, provides federal habeas relief
may not be granted on any claim that was adjudicated on the
merits in the state courts unless the state court's adjudication
of the claim resulted in a decision based on an unreasonable
determination of the facts in light of the evidence presented in
the state court proceeding. *Wood v. Allen*, ___ U.S. ___, ___, 130
S.Ct. 841, 849, 175 L.Ed.2d 738 (2010)("[A] state-court factual

36

determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, ___ U.S. at ___, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341-42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S.Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162

L.Ed.2d 196 (2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).  It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen*, ___ U.S. at ___, 130 S.Ct. at 849 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339, 126 S.Ct. at 974 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of

the ultimate decision reached by the state court and not evaluate
the quality, or lack thereof, of the state court's written
opinion supporting its decision. *See Maldonado v. Thaler*, 625
F.3d 229, 239 (5th Cir. 2010)(federal habeas review of a state
court's adjudication involves review only of a state court's
decision, not the written opinion explaining the decision), *cert.
denied*, ___ U.S. ___, 132 S.Ct. 124, 181 L.Ed.2d 46 (2011); *St.
Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006)(holding
Section 2254(d) permits a federal habeas court to review only a
state court's decision and not the written opinion explaining
that decision), *cert. denied*, 550 U.S. 921 (2007); *Amador v.
Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006)(holding the same),
*cert. denied*, 550 U.S. 920 (2007); *Pondexter v. Dretke*, 346 F.3d
142, 148 (5th Cir. 2003)(holding the precise question before a
federal habeas court in reviewing a state court's rejection on
the merits of an ineffective assistance claim is whether the
state court's ultimate conclusion was objectively reasonable),
*cert. denied*, 541 U.S. 1045 (2004); *Anderson v. Johnson*, 338 F.3d
382, 390 (5th Cir. 2003)(holding a federal habeas court reviews
only a state court's decision and not the opinion explaining that
decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002)(*en
banc*)(holding a federal court is authorized by §2254(d) to review
only a state court's decision and not the written opinion
explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. **Exclusion of Petitioner's Videotape of Administrative Segregation Facilities at a TDCJ Unit**

**A.   The Claim**

In his seventh and eighth claims in his amended petition, petitioner argues the state trial court's exclusion of defendant's exhibit no. 2, a videotape recording showing the administrative segregation facilities of the Texas Department of Criminal Justice's Mark Michaels Unit, violated petitioner's Eighth and Fourteenth Amendment right to present "mitigating evidence" at the punishment phase of petitioner's capital murder trial.[72]

**B.   State Court Disposition**

During the punishment phase testimony of defense expert Dr. Dickerson, petitioner's trial counsel offered defense exhibit no. 2, a fifty-seven minute videotape showing the administrative segregation facilities at the TDCJ's Mark Michael's Unit.[73]   The trial court deferred ruling on the admissibility of same until the prosecution had an opportunity during the evening to examine the tape.   The following day, the prosecution objected to the

---

[72] Petitioner's Amended Petition, filed February 23, 2011, docket entry no. 122 (henceforth "Amended Petition"), at pp. 172-201.

[73] S.F. Trial, Volume 24, testimony of Dr. Windel Lee Dickerson, at pp. 169-70.

videotape on the grounds it was not relevant and, even if
relevant, it was cumulative of Dr. Dickerson's testimony and did
not add anything to assist the jury in answering the special
issues.[74]  The trial court sustained the prosecution's objection,
concluding the tape was of questionable relevance, did not
purport to be a comprehensive description of the TDCJ's methods
of operation, but, rather only showed an excerpt of same, posed
the danger of misleading the jury, and amounted to cumulative
evidence.[75]

During his cross-examination of prosecution expert Royce
Smithey, petitioner's trial counsel re-urged admission of the
videotape, arguing the videotape refuted Mr. Smithey's contention
the TDCJ "cannot control inmates."[76]  The trial court denied
petitioner's request.[77]

In his motion for new trial, petitioner argued the trial
court had erred in excluding the videotape of the Michaels Unit's

---

[74] S.F. Trial, Volume 25, at p. 4.

[75] S.F. Trial, Volume 25, at pp. 5-6.

[76] S.F. Trial, Volume 25, testimony of Royce Smithey, at p.
81.

[77] *Id.*

administrative segregation facilities.[78]  The trial court denied
same.[79]

In his third, fourth, and fifth points of error on direct
appeal, petitioner argued the trial court's exclusion of the
videotape in question violated Texas Rules of Evidence and the
Eighth and Fourteenth Amendments.[80]  The Texas Court of Criminal
Appeals rejected all of these arguments on the merits. *Sells v.
State*, 121 S.W.3d at 765-66.

C.   Clearly Established Federal Law

Federal habeas corpus relief will not issue to correct
errors of state constitutional, statutory, or procedural law,
unless a federal issue is also presented. *See Estelle v. McGuire*,
502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385
(1991)(holding complaints regarding the admission of evidence
under California law did not present grounds for federal habeas
relief absent a showing that admission of the evidence in
question violated due process); *Lewis v. Jeffers*, 497 U.S. 764,
780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)(recognizing
that federal habeas relief will not issue for errors of state
law); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79

---

[78] Trial Transcript, at pp. 281-84.

[79] Trial Transcript, at p. 286.

[80] Appellant's Brief, at pp. 23-37.

L.Ed.2d 29 (1984)(holding a federal court may not issue the writ on the basis of a perceived error of state law); *Goodrum v. Quarterman*, 547 F.3d 249, 261 (5th Cir. 2008)("'it is not the province of a federal habeas court to reexamine state court determinations on state-law questions' such as the admissibility of evidence under state procedural rules"), *cert. denied*, ___ U.S. ___, 128 S.Ct. 1612, 173 L.Ed.2d 1000 (2009).

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire*, 502 U.S. at 67-68, 112 S.Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874.

> When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991).

A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115

L.Ed.2d 720 (1991); *Darden v. Wainwright*, 477 U.S. 168, 179-83, 106 S.Ct. 2464, 2470-72, 91 L.Ed.2d 144 (1986); *Goodrum v. Quarterman*, 547 F.3d at 261; *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314 (2008); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005), *cert. denied*, 546 U.S. 1217 (2006).

The question before this Court is not whether the state trial court properly applied state evidentiary rules but, rather, whether petitioner's federal constitutional rights were violated by the state trial court's rulings on evidentiary matters. *See Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005)(holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution), *cert. denied*, 546 U.S. 900 (2005).

> Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair."  It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."
>
> The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial."  We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'"  This is a high hurdle, even without AEDPA's added level of deference.

*Gonzales v. Thaler,* 643 F.3d 425, 430-31 (5th Cir. 2011)

(Footnotes omitted).

D.   <u>AEDPA Analysis</u>

Contrary to the contentions underlying petitioner's seventh and eighth claims herein, neither the Eighth nor the Fourteenth Amendments renders superfluous state rules of evidence during the punishment phase of a capital murder trial.  Petitioner's reliance upon the Supreme Court's holdings in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), is misplaced.  Both of those opinions addressed situations in which a state trial court excluded on hearsay grounds evidence showing that a person other than the defendant had confessed to committing the same capital murder for which the defendant was being prosecuted.  In stark contrast, the petitioner's proffered videotape showing the operations and security procedures within the Michael Unit's administrative segregation housing facilities do not share any similarity with such evidence to the special issues properly before petitioner's capital sentencing jury.

1.   <u>No Eighth Amendment Violation</u>

The Supreme Court has made it clear States are permitted under the Eighth Amendment to guide the discretion exercised by capital sentencing juries so long as the jury is not precluded from giving mitigating effect to evidence that does lessen the

defendant's moral culpability or blameworthiness for his crime. *See Johnson v. Texas*, 509 U.S. 350, 62, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993)(holding (1) there is no constitutional requirement of unfettered sentencing discretion in the jury and (2) States are free to "structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty."); *Boyde v. California*, 494 U.S. 370, 377, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990)(holding the same).   Evidence detailing the conditions under which Texas prison inmates assigned to administrative segregation are housed does not address the defendant's moral culpability or blameworthiness for his crime.   Thus, insofar as the state trial court concluded the videotape was not relevant to the special issues before the jury at the punishment phase of petitioner's capital murder trial, that conclusion was neither objectively unreasonable under the Supreme Court's Eighth Amendment jurisprudence nor otherwise inconsistent with clearly established federal law.

Likewise, a capital murder defendant is not entitled to present any and all evidence the defendant subjectively believes to have "mitigating value" without regard for concerns of trial management, jury confusion, or unfair prejudice.   For instance, the fact a capital murder defendant's co-defendant received a life sentence for participating in the same capital offense as

46

the defendant does not render evidence of the co-defendant's life sentence admissible during the punishment phase of the defendant's capital murder trial, even when the co-defendant actually delivered the fatal blow. *See Cordova v. Johnson*, 157 F.3d 380, 383 (5th Cir. 1998)(a capital defendant is not entitled to introduce evidence of a co-defendant's sentence because such sentence is irrelevant to a defendant's "character, prior record, or the circumstances of the offense."), *cert. denied*, 525 U.S. 1131 (1999).

Exclusion of the petitioner's proffered videotape did not preclude petitioner from presenting any relevant, material, mitigating evidence to petitioner's capital sentencing jury. Dr. Dickerson testified extensively concerning his view that the tools available to TDCJ personnel (including medication, close supervision, and *potential placement in administrative segregation facilities*) would be sufficient to reduce the risk of future dangerousness or violence from petitioner while incarcerated to a manageable level.[81]

2.   No Due Process Violation

The state trial court and Texas Court of Criminal Appeals both concluded admission of the nearly hour-long videotape showing administrative segregation facilities at the TDCJ's Mark

---

[81] S.F. Trial, Volume 24, testimony of Dr. Windel Lee Dickerson, at pp. 161-73; Volume 25 testimony of Dr. Windel Lee Dickerson, at pp. 20-37.

Michaels Unit posed the potential to confuse the jury because, in part, there was no evidence showing that, had petitioner received a life sentence, he would ever have been housed in administrative segregation at the Michaels Unit. *Sells v. State*, 121 S.W.3d at 765-66.  The prosecution's expert, Royce Smithey, testified without contradiction (1) not all TDCJ Units possessed administrative segregation facilities, (2) there were differences, because of differences in design and operation, between TDCJ Units in the manner in which inmates were housed when placed in administrative segregation at those Units, (3) there are no "administrative segregation units" within the TDCJ, only administrative segregation facilities within some, but not all, Units, (4) even when in administrative segregation, inmates have daily contact with guards and other prison personnel, and (5) classification of an inmate into administrative segregation is not automatic.[82]  As the Texas Court of Criminal Appeals pointed out, petitioner did not accompany the proffered videotape with any evidence showing the information contained thereon addressed the petitioner's individual circumstances or how the petitioner might be handled if incarcerated for "life." *Sells v. State*, 121 S.W.3d at 766.

---

[82] S.F. Trial, Volume 25, testimony of Royce Smithey, at pp. 58-82.

48

Having benefitted from reviewing hundreds, if not thousands of federal civil rights lawsuits and habeas corpus actions filed in this Court over the past two decades, with the attendant review of untold reams of TDCJ disciplinary and classification records, this Court has more than a passing familiarity with the manner in which TDCJ personnel administratively classify inmates. Contrary to the implications underlying the testimony of Dr. Dickerson and the arguments of petitioner's trial counsel, there is no rational basis to believe that, had petitioner received a sentence of life imprisonment, petitioner would have spent the following forty years (or any substantial portion thereof) locked away in administrative segregation. As Mr. Smithey testified, the only locations within TDCJ where inmates are housed in conditions analogous to administrative segregation on a permanent basis is death row.[83] This Court takes judicial notice of the reality that, while a TDCJ inmate's offense of conviction is a consideration in the classification process, conviction for murder, even capital murder, does not *per se* mandate *permanent* classification of that inmate in administrative segregation. This Court notes that all TDCJ inmates are routinely and periodically reviewed for adjustment of their classification status. Even when placed in administrative segregation, usually for misbehavior during incarceration, an inmate does not remain

---

[83] *Id.*, at pp. 74-75.

49

in administrative segregation permanently for the duration of his sentence without any possibility of review of that determination. It has been this Court's experience that even those TDCJ inmates assigned to administrative segregation for serious breaches of discipline rarely remain there for significant periods of time, much less permanently. Most inmates assigned to administrative segregation remain there only until either (1) they have served a period deemed sufficient by prison officials to punish them for breaking prison rules or (2) the inmate indicates to prison officials a willingness to obey prison rules and to refrain from further breaches of those rules. Thus, the suggestions implicit in Dr. Dickerson's testimony and the arguments of petitioner's trial counsel (that petitioner faced the realistic prospect of permanent placement in administrative segregation for the duration of his forty-year "life sentence") urged in support of the admission of defense exhibit no. 2 were, at best, disingenuous and, at worst, misleading.

Under such circumstances, exclusion of the petitioner's proffered videotape of the TDCJ's Mark Michaels Unit's administrative segregation housing facilities did not constitute an egregious evidentiary error or render petitioner's capital murder trial fundamentally unfair. *See Simmons v. Epps*, 654 F.3d 526, 542-44 (5th Cir. 2011)(holding exclusion during the punishment phase of a capital murder trial of a videotape in

which a capital murder defendant expressed remorse without directly admitting the murder did not render the trial fundamentally unfair), *cert. filed December 27, 2011 (no. 11-8085)*. On the contrary, the petitioner's trial counsel's and expert's arguments implicitly suggesting the videotape accurately reflected the conditions under which petitioner would likely spend the bulk of a "life sentence" were, at best, highly speculative and, at worst, factually erroneous.

The exclusion of petitioner's proffered videotape did not render petitioner's capital sentencing hearing fundamentally unfair. Given Mr. Smithey's unchallenged testimony that not all TDCJ facilities possessed administrative segregation facilities and there were significant differences between TDCJ Units in the manner of operation for those administrative segregation facilities which did exist, the videotape was of dubious relevance, at best. Insofar as it was relevant, the videotape was cumulative of Dr. Dickerson's testimony regarding the tools available to TDCJ officials to reduce the risk of future violence from petitioner. Therefore, exclusion of the videotape did not play a "crucial, critical, and highly significant role" in the punishment phase of petitioner's capital murder trial.

E.   Conclusions

The Texas Court of Criminal Appeals' rejections on the merits during the course of petitioner's direct appeal of

petitioner's Eighth and Fourteenth Amendment challenges to the
state trial court's exclusion of petitioner's proffered videotape
of the TDCJ's Mark Michael Unit's administrative segregation
facilities were neither contrary to, nor involved an unreasonable
application of, clearly established Federal law, as determined by
the Supreme Court of the United States, nor based upon an
unreasonable determination of the facts in light of the evidence
presented in the petitioner's trial, motion for new trial, and
direct appeal proceedings.  Petitioner's seventh and eighth
claims herein do not warrant relief under the AEDPA.

## IV. <u>Prohibition on Voir Dire Regarding Parole</u>

A.    <u>The Claim</u>

In his second claim herein, petitioner argues the state
trial court erred in refusing to permit petitioner's trial
counsel to voir the jury venire individually regarding each
venire member's view on Texas parole law via-a-vis a capital
sentence.[84]

---

[84] Amended Petition, at pp. 106-51.  Petitioner's Amended
Petition consists substantially of a verbatim recitation of six
through nineteen, many of which raised purely state
constitutional claims.  Insofar as petitioner's second claim
herein can be construed as asserting grounds for relief based on
alleged violations of the Texas Constitution, those grounds are
non sequitur.  Federal habeas corpus relief will not issue to
correct errors of state constitutional, statutory, or procedural
law, unless a federal issue is also presented. See *Estelle v.
McGuire*, 502 U.S. at 67-68, 112 S.Ct. at 480 (holding complaints
regarding the admission of evidence under California law did not
present grounds for federal habeas relief absent a showing that
admission of the evidence in question violated due process);

B.    State Court Disposition

At the time of petitioner's trial, Texas law provided that, upon written request by defense counsel, a capital sentencing jury be charged as follows:

> Under the law applicable to this case, if the defendant is sentenced to life imprisonment, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time.  It cannot be accurately predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on the decisions made by the prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.[85]

At the conclusion of the evidence at the punishment phase of petitioner's capital murder trial, the state trial court instructed petitioner's jury in this manner, in language almost identical to that set forth above.[86]

---

*Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102 (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874 (holding a federal court may not issue the writ on the basis of a perceived error of state law).

[85] Article 37.071, §2(e)(2)(B), Texas Code of Criminal Procedure Annotated, (Vernon Supp. 1999).

[86] Trial Transcript, at pp. 274-75.  The petitioner's actual punishment phase jury instruction included a reference to the "Institutional Division of the Texas Department of Criminal Justice" but otherwise tracked the statutory language.

In a pretrial motion,[87] petitioner's trial counsel sought leave to ask members of the jury venire the following four questions:

> 1. Would the minimum length of time a defendant could serve in prison before he could be paroled be something you would want to know in answering the special issues?
>
> 2. On which special issue would this be important? How would this 40 year minimum sentence be important to you in answering the special issues?
>
> 3. Would you be more likely, or less likely, generally, to view a defendant as a continuing threat to society if you knew he could not be paroled for a minimum of 40 years?
>
> 4. What kind of evidence would you expect, as a juror, to help you in considering the 40-year parole ineligibility factor when answering the special issue?

*Sells v. State,* 121 S.W.3d at 755.

At several points during individual voir dire, petitioner's counsel was permitted to ask individual members of the jury venire whether they could obey the law and disregard any impact parole might play on the duration of a life sentence for petitioner when answering the Texas capital sentencing special issues.[88]

---

[87] Trial Transcript, at pp. 53-54.

[88] *See, e.g.,* S.F. Trial, Volume 6, voir dire examination of Hilda C. Lopez, at p. 100; voir dire examination of Rita A. Cardenas, at p. 168; voir dire examination of James C. Jones, at p. 208; voir dire examination of Kimberly R. Middleton, at p. 240; Volume XVII, voir dire examination of Ayde Rodarte, at p. 16.

At several other points during individual voir dire, the state trial court refused to permit petitioner's trial counsel to ask the four questions set forth above.[89]

In his motion for new trial, petitioner argued the trial court had erred in refusing to permit petitioner's trial counsel to voir dire the jury venire using the four questions listed above.[90]  The state trial court denied petitioner's motion for new trial in an Order issued November 2, 2000.[91]

In his seventh, ninth, eleventh, thirteenth, fifteenth, seventeenth, and nineteenth points of error on direct appeal, petitioner argued the state trial court's refusal to permit petitioner's trial counsel to voir dire seven identified members of the jury venire utilizing the four questions regarding parole violated due process principles.[92]

---

[89] *See, e.g.,* S.F. Trial, Volume 6, voir dire examination of Miriam Carrizales, at pp. 67-69; voir dire examination of Patty C. Harrison, at p. 129; voir dire examination of Rita A. Cardenas, at p. 171; voir dire examination of Craig G. Alexander, at pp. 268-69; Volume 7, voir dire examination of Lucrecia Almond, at p. 27; Volume 8, voir dire examination of Hijinio H. Cuellar, at p. 40; voir dire examination of William C. Cooper, at p. 136; Volume 11, voir dire examination of John H. Reavis, at p. 82.

[90] Trial Transcript, at pp. 281-84.

[91] Trial Transcript, at p. 286.

[92] Appellant's Brief, at pp. 48-49, 52-53, 56-57, 60-61, 64-65, 68-69, 73-74.

The Texas Court of Criminal Appeals rejected all of these points of error on the merits:

> The trial court has broad discretion over the process of selecting a jury. Without the trial court's ability to impose reasonable limits, voir dire could go on indefinitely. Thus, we leave to the trial court's discretion the propriety of a particular question and will not disturb the trial court's decision absent an abuse of discretion. A trial court abuses its discretion when it prohibits a proper question about a proper area of inquiry. A question is proper if it seeks to discover a juror's views on an issue applicable to the case. However, an otherwise proper question is impermissible if the question attempts to commit the juror to a particular verdict based on particular facts. In addition, a trial judge may prohibit as improper a voir dire question that is so vague or broad in nature as to constitute a global fishing expedition.
>
> With the change in the law effective September 1, 1999, a jury may now be instructed on a capital defendant's eligibility for parole. Assuming, without deciding, that the statutory change renders questioning about parole permissible in some situations, appellant has failed to show error here.
>
> To preserve error, appellant must show that he was prevented from asking *particular* questions that were proper. That the trial court generally disapproved of an area of inquiry from which proper questions could have been formulated is not enough because the trial court might have allowed the proper question had it been submitted for the court's consideration. Here, none of appellant's proposed questions were proper.
>
> All of appellant's questions relate to how a particular fact (in this case, the minimum amount of time a capital life defendant must be incarcerated before becoming eligible for parole) might influence jury deliberations. These types of questions implicate the strictures imposed by *Standefer* against commitment questions and by *Barajas* against ambiguous questions. Appellant's questions all appear to be attempts, either directly or through ambiguously worded questions, to commit the veniremembers to giving mitigating or aggravating effect to the minimum parole eligibility requirement. Appellant's first proposed question—about whether a veniremember would want to know the minimum

time a defendant could serve in prison before he could be paroled—is not strictly relevant to a juror's duties or any issue in the case.  What the jurors wants to know is immaterial; the trial court will give jurors the proper information about the application of the law.  The perceived relevance of the question stems from *why* a juror wants to know about parole law.  This implied "why" question is ambiguous.  Does the prospective juror want to know minimum parole eligibility because that knowledge will foreclose honest consideration of the special issues or because that knowledge will have an impact on how evidence is evaluated with regard to the special issues?  If the latter, the question is really designed to determine whether the veniremember would give, or to commit the veniremember to giving, mitigating or aggravating impact to the minimum parole eligibility requirement. Appellant's second and fourth questions invite the prospective jurors to set the parameters for their decision-making by determining to which special issues the parole eligibility instruction would be considered relevant, the mitigating or aggravating impact the instruction would have on the juror's consideration of the special issues, and what evidence would tend to accentuate or minimize the parole instruction's mitigating or aggravating effect.  Appellant's third question directly seeks to determine whether a prospective juror will give the parole instruction mitigating or aggravating effect in the context of the future dangerousness special issue.  Although a capital life inmate's minimum parole eligibility is in some sense a fact, it is also codified by statute and now provided for by statute as an instruction.  Because of this incorporation into the statutory framework, a prospective juror must be able to keep an open mind on the punishment special issues even after acquiring knowledge of this fact.  But the law neither requires nor precludes the factoring of the parole instruction into the jurors' analysis of the special issues; so, any attempt to commit prospective jurors to giving mitigating, aggravating, or even no effect to the parole instruction is impermissible.  Thus, the trial judge did not err when he refused to allow appellant to ask the entire venire or various individual veniremembers the proposed questions on the law of parole. Points of error six through nineteen are overruled.

*Sells v. State*, 121 S.W.3d at 755-57 (*Footnotes omitted*).

C.    Clearly Established Federal Law

To be constitutionally compelled, it is not enough that requested voir dire questions might be helpful.  Rather, the trial court's failure to ask (or permit counsel to ask) the questions must render the defendant's trial fundamentally unfair. *Morgan v. Illinois*, 504 U.S. 719, 730 n.5, 112 S.Ct. 2222, 2230 n.5, 119 L.Ed.2d 492 (1992); *Mu'Min v. Virginia*, 500 U.S. 415, 425-26, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493 (1991).

D.    AEDPA Analysis

The authorities cited by petitioner in support of his second claim herein do not establish that petitioner was entitled to voir dire venire members on their personal views on a subject (the impact of petitioner's potential parole eligibility) which petitioner's petit jurors were specifically instructed in accordance with state law they could *not* consider when answering the Texas capital sentencing special issues.

The first Supreme Court opinion on which petitioner relies, *Morgan v. Illinois*, *supra*, held that a state trial court was required to permit the voir dire of potential jurors on whether they would automatically vote to impose the death penalty if the defendant were convicted of capital murder *regardless* of the mitigating evidence introduced at the punishment phase of trial. *Morgan v. Illinois*, 504 U.S. at 729-34, 113 S.Ct. at 2230-32. The petitioner's potential eligibility for release on parole did

not constitute "mitigating evidence" within the meaning of the Eighth Amendment because it did not lessen the defendant's moral culpability or blameworthiness for his crime. *Johnson v. Texas*, 509 U.S. at 62, 113 S.Ct. at 2666.  Even if it did, petitioner's capital sentencing jury was properly instructed in accordance with Texas law at that time regarding the availability of release on parole for a capital murder defendant sentenced to serve a term of "life imprisonment."

The peculiarities of Texas parole statutes and good time credit rules at the time of petitioner's offense and trial have no relevance, legally or logically, to any of the Texas capital sentencing special issues. *Gomez v. Quarterman*, 529 F.3d 322, 335 (5th Cir.)(holding a defendant can receive a jury instruction regarding parole ineligibility only if there exists a life-without-possibility-of-parole alternative to the death penalty - an option not available at the time of petitioner's capital murder trial), *cert. denied*, 555 U.S. 1050 (2008); *Thacker v. Dretke*, 396 F.3d 607, 617-19 (5th Cir.) (rejecting a wide variety of constitutional claims urging adoption of a rule mandating jury instructions on the effect of Texas parole laws on a life sentence), *Cert. denied*, 546 U.S. 840 (2005); *Martinez v. Dretke*, 426 F.Supp.2d 403, 512 (W.D. Tex. 2006), *CoA denied*, 270 Fed. Appx. 277, 2008 WL 698946 (5th Cir. March 17, 2008).

Likewise, petitioner's reliance on the Supreme Court's opinion in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), is misplaced.  In *Simmons*, the Supreme Court addressed capital sentencing in South Carolina and other jurisdictions which authorized capital sentencing juries to impose sentences of either death or life without the possibility of parole. *See Simmons v. South Carolina*, 512 U.S. 154, 168-69 & n.8, 114 S.Ct. 2187, 2196 & n.8, 129 L.Ed.2d 133 (1994), (plurality opinion specifically explaining that, as of that date, Texas courts traditionally kept capital sentencing juries unaware of the availability of parole for those sentenced to serve terms of life imprisonment).  Representing the views of three members of the Supreme Court, Justice O'Connor's concurring opinion in *Simmons* is significant because it emphasized South Carolina law provided a capital defendant faced the possibility of life without parole. *Id.*, 512 U.S. at 176-78, 114 S.Ct. at 2200-01 (concurring opinion).

The Supreme Court's subsequent opinion in *Ramdass v. Angelone*, 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000), continued the vitality of this distinction, as the plurality opinion for the Supreme Court therein specifically limited the holding in *Simmons* to "only those instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Id.*, 530 U.S. at 169,

120 S.Ct. at 2121.   In her separate, pivotal, concurring, opinion in *Ramdass*, Justice O'Connor once again emphasized her view of the continued vitality of the rule in *Simmons*, as enunciated by the plurality in *Ramdass*, and also pointed out *Ramdass* came before the Supreme Court in the context of a federal habeas corpus proceeding, in which the Supreme Court's review, like this Court's review in the present cause, is circumscribed by the terms of the AEDPA. *Id.*, 530 U.S. at 179, 120 S.Ct. at 2126 (concurring opinion).

More recently, the Supreme Court's opinion in *Shafer v. South Carolina*, 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001), at least implicitly acknowledged the continued vitality of the distinction first noted in *Simmons* by holding South Carolina's new capital sentencing scheme was guilty of the same constitutional defect identified in *Simmons because*, at least under some circumstances, the sentencing jury would be faced with a choice between a sentence of death and a sentence of life without the possibility of parole. *See Shafer v. South Carolina*, 532 U.S. at 51, 121 S.Ct. at 1273 ("We therefore hold that whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole.").

61

In *Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002), the Supreme Court reiterated its holding in *Shafer*, emphasizing once again South Carolina capital sentencing juries which unanimously found the presence of an aggravating circumstances were left to select between one of only two possible sentences: death or life imprisonment without the possibility of parole. *Kelly v. South Carolina*, 534 U.S. at 252 & n.2, 122 S.Ct. at 730 & n.2.

While Texas has recently joined South Carolina and other jurisdictions which provide capital sentencing juries the option of sentencing a convicted capital murderer to a term of life without parole, at the time of petitioner's offense and trial, Texas law did not provide for a sentence of life imprisonment without the possibility of parole. The Supreme Court's Fourteenth Amendment jurisprudence, including *Simmons*, *Ramdass*, *Shafer*, and *Kelly*, makes an express distinction between the rule applied in *Simmons* and *Shafer* and the due process requirements in jurisdictions such as Texas at the time of petitioner's crime and capital murder trial, where sentences of either death or life without parole are *not* the only choices facing a capital sentencing jury. The legal premise underlying petitioner's second claim herein ignores this critical distinction. There is simply no "clearly established" federal law, as enunciated by the United States Supreme Court, holding the Fourteenth Amendment's

Due Process Clause requires potential jurors be subjected to voir dire regarding their personal views on the impact of parole eligibility in a capital sentencing context when those same jurors will necessarily be instructed in accordance with state law to *disregard* the defendant's potential parole eligibility at the punishment phase of trial. *Druery v. Thaler*, 647 F.3d at 544; *Gomez v. Quarterman*, 529 F.3d at 335; *Thacker v. Dretke*, 396 F.3d at 617-19.

Two of the Supreme Court opinions relied upon by petitioner held that potential jurors in a capital case involving an interracial crime must be interrogated on the issue of racial bias. *See Turner v. Murray*, 476 U.S. 28, 36-37, 106 S.Ct. 1683, 1687, 90 L.Ed.2d 27 (1986)("We hold that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of race bias."); *Ham v. South Carolina*, 409 U.S. 524, 527, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973)(holding the Due Process Clause required the state trial judge to conduct voir dire examination of potential jurors on the subject of racial prejudice). Petitioner does not allege any facts showing he and Kaylene Harris were of different races or different ethnic backgrounds. Nor does petitioner identify any potential racial animus or ethnic prejudice which petitioner claims interfered with the essential demands of fairness during his capital murder

trial.  As such, petitioner's reliance on *Turner*, *Ham*, and their progeny is misplaced.

Finally, in *Gardner v. Florida*, 420 U.S. 349, 360-62, 97 S.Ct. 1197, 1205-07, 51 L.Ed.2d 393 (1977), the Supreme Court struck down a capital sentence where the sentencing court imposed sentence, in part, based upon a confidential pre-sentence report which was not disclosed to petitioner or his trial counsel. Petitioner does not allege any facts showing his capital sentencing jury was furnished with any information other than the evidence actually presented during petitioner's trial. Petitioner's capital sentencing jury was properly instructed regarding the impact of Texas parole laws on any potential life sentence petitioner might receive.  The holding in *Gardner* is inapplicable to petitioner's case.

The four voir dire questions proffered by petitioner's trial counsel invited and encouraged petitioner's jury venire to do precisely what Texas precluded them from doing, i.e., speculate on how petitioner's potential parole eligibility (if sentenced to serve a term of life imprisonment) might impact the duration of petitioner's life sentence, when answering the Texas capital sentencing special issues.  Petitioner's trial counsel was permitted to ask potential jurors (and said counsel did ask several venire members) whether they could follow applicable state law and *disregard* the impact of parole on a potential life

sentence when answering the capital sentencing special issues.[93] Petitioner has not identified any voir dire answers or questionnaire answers given by any of the seven venire members identified in petitioner's appellant's brief suggesting any of those venire members were confused regarding the legal *inapplicability* of Texas parole law to a capital sentencing jury's consideration of the Texas capital sentencing special issues.  Under such circumstances, the refusal of the state trial court to permit petitioner's trial counsel to examine the entire jury venire in the manner requested, i.e., by asking the four parole-related questions listed above, did not render petitioner's trial fundamentally unfair.

E.   *Teague* Foreclosure

Respondent correctly points out the legal rule underlying petitioner's second claims herein, i.e., that a capital defendant has a constitutional right to inquire as to precisely how potential jurors would view the impact of Texas parole laws during their deliberations on the Texas capital sentencing special issues (at a time when Texas capital murder defendants were ineligible to receive a term of life imprisonment without the possibility of parole), would be a "new rule" of federal constitutional criminal procedure and is, therefore, barred from adoption in this federal habeas corpus proceeding by the non-

---

[93] *See* note 88, *supra*.

retroactivity principle announced in *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). *Druery v. Thaler*, 647 F.3d at 544-45; *Gomez v. Quarterman*, 529 F.3d at 335.

Under the Supreme Court's holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997)(holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would

66